UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| | |
|---|---|
| CELSA RAMIREZ-ROSALES, individually and as wife and next-of-kin of deceased, Evodio Abad-Castillo, | ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) |
| JACKIE MATHENY, Sheriff of Warren County, Tennessee, *et al.* | ) ) ) |
| *Defendants*. | ) ) |

Case No. 4:09-cv-109

Judge Mattice

### MEMORANDUM AND ORDER

Before the Court are the following motions:

- Motion for Summary Judgment and/or Motion to Dismiss by Sherry Bailey; Bruce Boyd; Jerry Britton; Dustin Curtis; Carol Darby; Kay Grider; Justin King; Edward D. Knowles; Jackie Matheny; Tommy Myers; Abel Rivera; Jorge Rivera; Christy Sturgill; Joseph VanBommel; Jason Wood; Anita Youngblood; and Warren County, Tennessee ("the Warren County Defendants") [Court Doc. 54]; and

- Motion for Summary Judgment by David Florence [Court Doc. 56].

For the reasons set forth below, both Motions for Summary Judgment [Court Docs. 54, 56] will be **GRANTED**. There are also a number of pending Motions *in Limine* before the Court. In light of this Order, all pending motions will be **DENIED AS MOOT**.

## I.    LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id*. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The non-moving party must present sufficient evidence from which a jury could reasonably find in her favor. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

-2-

## II.    FACTUAL BACKGROUND

The facts, viewed in the light most favorable to the Plaintiff, are as follows.

On June 25, 2009, Evodio Abad Castillo ("Castillo") was convicted in Warren County General Sessions Court of driving on a suspended or revoked license. (Court Doc. 67, Pl.'s Resp. at 7; Court Doc. 71-14 at 23). The same morning, Castillo was sentenced in part to five days of imprisonment and transported to the Warren County Jail. (Court Doc. 71-14 at 23, 57).[1]  Castillo was booked, and in response to Officer Sherry Bailey's intake questions, he indicated that he did not suffer from any serious medical condition that might require attention while in custody and that he understood that he could request a health care provider at any point during his incarceration. (*Id.* at 57). Castillo was housed alongside other inmates in the jail's general population. (Pl.'s Resp. at 3).

That afternoon, while nurse Kay Grider performed her rounds, one of Castillo's cellmates beckoned Grider over and indicated that Castillo was ill. (Court Doc. 71-3, Grider Dep. 10-11). When Grider arrived to speak with him, Castillo, whose primary language was Spanish and who spoke little to no English, raised his hands and pointed to his throat. (*Id.* at 9, 11). Grider asked Castillo if his throat was sore, and Castillo shook his head, apparently indicating that it was not. (*Id.* at 11). Grider did not physically examine Castillo, but she provided two ibuprofen pills and indicated in her medical report that he complained of swollen glands but no sore throat. (*Id.* at 13-14; Court Doc. 71-14 at 165).

The morning of June 26, 2009, a bilingual inmate accompanied Castillo to speak with Carol Darby, the nurse performing rounds that morning. (Court Doc. 71-4, Darby

---

[1] For the sake of clarity and consistency, this opinion cites exclusively to the page numbers assigned by the Court's Electronic Case Filing system.

Dep.9-10). The inmate stated that Castillo was sick, and Castillo pointed to his jaw. (*Id.* at 11). Darby thought he was indicating a toothache, and she gave him Tylenol. (*Id.* at 11).

At 12:30 a.m. on June 27, 2009, Correctional Officer Joseph VanBommel instructed Officers Jerry Britton and Newman Ford to check on Castillo, who was complaining of illness. (Court Doc. 71-10, VanBommel Dep. 13; Court Doc. 89-8, Britton Dep. 3). When Officers Britton and Ford arrived at the cell, a bilingual inmate stated that Castillo was sick and suffering from chills and a stomach ache. (Britton Dep. 3). VanBommel instructed the officers to bring Castillo to the booking area, so that he could be examined by Nurse Darby. (*Id.*). Once in booking, Officer Jorge Rivera, a Spanish-speaking correctional officer, spoke with Castillo about his condition. (Court Doc. 71-8, J. Rivera Dep. 11). Castillo was shivering and, pointing to his head, said "it hurts." (J. Rivera Dep. 11-12). The officers instructed Castillo to lie on a mattress, gave him water and crackers, and because he appeared cold, gave him a blanket. (*Id.* at 16; Britton Dep. 3).

Nurse Darby arrived at 2:30 a.m. and examined Castillo. (Britton Dep. 3; Darby Dep. 13-15). Through Officer Rivera, Castillo told her that he felt sick, pointed to his throat, and began massaging it. (Darby Dep. 15). Darby palpitated his throat but felt no swelling. (*Id.*). She then performed a physical examination on Castillo, which revealed that his body temperature was 95.4 degrees, though he did not feel cool to the touch. (*Id.* at 17-18). Darby gave Castillo Tylenol, and through Officer Rivera, Castillo said that he was feeling better and wished to return to his cell. (*Id.* at 16, 18; Britton Dep. 4). Darby gave Castillo Tylenol twice more while making her rounds: once later that day, and again early the next

-4-

morning. (Darby Dep. 19).

The morning of June 28, 2009, Officers Abel Rivera and Jerry Britton moved Castillo from the cell he shared with other inmates to a one-man cell in "D Pod," a different section of the jail.[2] (Britton Dep. 4-5; Court Doc. 71-9, A. Rivera Dep. 14-15). Inmates told the officers that Castillo was stealing food from his cellmates, and the officers transferred him in order to protect him from retaliatory violence. (Britton Dep. 4; A. Rivera Dep. 11-14). Both Britton and Rivera noted that Castillo did not make any health complaints while being transferred to his new cell, and he appeared healthy. (Britton Dep. 5; A. Rivera Dep. 16-17). That afternoon, while Nurse Darby was making her rounds, she gave Castillo another dose of Tylenol, but he immediately returned it. (Darby Dep. 22). He appeared healthy to Nurse Darby, but he did not respond when she asked if he was feeling better. (*Id.* at 22-23).

Around 2:00 a.m. on June 29, an inmate told Officer Britton that yelling or choking sounds were emanating from D Pod. (Court Doc. 71-14 at 73; A. Rivera Dep. 18; Britton

---

[2] The Court reiterates its prior ruling regarding the "inmates' statement," to which Plaintiff has cited in her Responses to the Defendants' Motions for Summary Judgment. (Court Docs. 109-1,110; see Pl.'s Resp. at 10; Court Doc. 68, Pl.'s Resp. to Florence at 6). The document, Bates-stamped 00194-00195, purports to be a letter from 13 inmates of the Warren County Jail to "readers of the *Southern Standard* [i.e., a McMinnville, Tennessee newspaper]" negatively describing Castillo's condition on June 28th and 29th, and criticizing the jail staff's alleged responses. Evidence submitted in opposition to a motion for summary judgment must be admissible at trial, and this document suffers from a number of deficiencies that render it inadmissible. See *Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009). Most notably, the document is addressed to a newspaper, unsworn, and bears no indication that it was made under penalty of perjury. The Sixth Circuit has held that district courts "may not consider unsworn statements when ruling on a motion for summary judgment." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010) (quotation omitted). Further, even assuming it is not inadmissible hearsay, the document lacks any indicia of reliability, and there is no indication that it complies with the requirements of Fed.R.Civ.P. 56(c)(4). There are a number of alternative avenues Plaintiff could have taken in attempting to admit into evidence the substance of the inmates' statement, but ultimately, she has made no such attempt. The Court therefore afforded this document no consideration when ruling on the instant Motions for Summary Judgment.

-5-

Dep. 7; VanBommel Dep. 26-27).[3] Britton was not near the cell, and he contacted Officer VanBommel requesting assistance. (Britton Dep. 27). VanBommel and Abel Rivera went to investigate, and although they could not discover the source of the noise, an inmate directed them to Castillo's cell. (A. Rivera Dep. 18; VanBommel Dep. 26, 28, 32). Speaking in Spanish, Rivera asked Castillo what was wrong, and Castillo replied that he was hot and thirsty. (A. Rivera Dep. 18). The officers took Castillo out of his cell and brought him to the booking area for observation. (*Id.* at 18-19). Castillo again indicated that he was thirsty, and the officers brought him water. (*Id.*). Rivera offered to let Castillo shower, but Castillo declined, and Rivera brought him more water. (Court Doc. 71-14 at 73). The officers continued to converse with Castillo, asking if he was sick and offering to call a nurse. (*Id.*; A. Rivera Dep. 21). Castillo said that he felt better and did not need to see a nurse, and he asked Rivera and VanBommel to return him to his cell. (Court Doc. 71-14 at 73; A. Rivera Dep. 20-21). The officers requested that he continue to rest for a few more minutes, but after he continued to insist that he was feeling better and ready to return, the officers escorted him back. (Court Doc. 71-14 at 73; A. Rivera Dep. 20-21). Later, Rivera informed Nurse Christy Sturgill of the incident, and he suggested that she may wish to speak with Castillo. (Court Doc. 71-14 at 74; Court Doc. 71-5, Sturgill Dep. 32-33). Sturgill replied that she would examine him in the booking room, but because the officers had to deal with a violent inmate elsewhere in the jail, they never returned with Castillo. (Court Doc. 71-14 at 74, 160; Sturgill Dep. 32-33).

---

[3] The Court notes that Plaintiff, citing to Abel Rivera's deposition and incident report, asserts that Rivera was "informed that the Deceased was choking" and that "Mr. Castillo was found choking." (Pl.'s Resp. 10, 19). That is not correct. Rather, Officer Britton was told that "someone" in "D Pod" was making "choking" and "yelling" noises. (Court Doc. 71-14 at 73; A. Rivera Dep. 18; Britton Dep. 7; VanBommel Dep. 26-27). Britton then radioed for officers to investigate, and Rivera responded. (Britton Dep. 27).

-6-

Later, Officer Jason Wood encountered Castillo while conducting a head count. (Court Doc. 71-7, Wood Dep. 8). Wood asked if Castillo was feeling okay, and Castillo "shook his head yes." (*Id.* at 9). Mumbling emanated from Castillo's cell throughout the day. (Court Doc. 71-6, King Dep. 16, 21; Court Doc. 71-14 at 70). The mumbling stopped around the time the inmates were preparing for dinner. (Court Doc. 71-14 at 70).

At approximately 4:00 p.m., an inmate informed Officer Justin King that Castillo did not appear to be breathing. (King Dep. 22-23). Upon investigating, Officers King and Wood discovered Castillo lying in his cell – King checked for a pulse and found none. (*Id.* at 23). The officers called for a nurse, and Nurse Grider arrived at the cell and confirmed that Castillo had no pulse. ( Court Doc. 71-14 at 70; Grider Dep. 18-21). Castillo's body was transported to the hospital, where he was pronounced dead. (Court Doc. 71-14 at 10). An autopsy conducted by the Warren County Medical Examiner's Office concluded that the cause of Castillo's death was "complications of bronchopneumonia" and the manner of death was "natural." (*Id.* at 10-15).

In November 2009, Castillo's wife, Celsa Ramirez-Rosales ("Plaintiff") filed suit pursuant to 42 U.S.C. §§ 1983 and 1986, alleging that the Defendants' conduct constituted a violation of Castillo's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.[4] (Court Doc. 1, Compl. ¶ 39). Plaintiff further raised a claim against Sheriff Matheny pursuant to T.C.A. §§ 8-8-103 and 8-8-301, as well as a wrongful-death claim against all Defendants under Tennessee state law, alleging that the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101, *et seq.*, waived

---

[4] In a prior Order, the Court dismissed several parties who were initially listed as plaintiffs, as well as Plaintiff's loss-of-consortium claims. (*See* Court Doc. 44).

-7-

the government's immunity and exposed the Defendants to suit. (*Id.* at ¶¶ 40, 42). After discovery, the Defendants filed the instant Motions for Summary Judgment. (Court Docs. 54, 56).

## III. ANALYSIS

As a preliminary matter, the Court must address three elements of Plaintiff's claims before reaching the substance of the Defendants' Motions for Summary Judgment. First, in her response to the Warren County Defendants' Motion for Summary Judgment, Plaintiff indicates that Defendants Bailey, Boyd, Curtis, Myers, Youngblood, and York had no involvement in Castillo's death or the attendant circumstances. (Pl.'s Resp. at 2). Plaintiff expressly acknowledges that these defendants should be dismissed. (*Id.*). After reviewing the record, the Court agrees. Accordingly, Plaintiff's claims against Defendants Sherry Bailey, Bruce Boyd, Dustin Curtis, Tommy Myers, Anita Youngblood, and Kevin York will be **DISMISSED WITH PREJUDICE**.

Next, Plaintiff's claim under 42 U.S.C. § 1986 is without merit.[5] "Section 1986 creates a cause of action for knowing failure to prevent wrongful acts pursuant to a conspiracy to interfere with civil rights, as described in 42 U.S.C. § 1985." *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir.1990). To prevail on a § 1985 claim of the type asserted here, a plaintiff must prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

---

[5] Plaintiff also brought suit pursuant to 42 U.S.C. § 1988, presumably for attorney's fees.

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir.2005) (quotation omitted) (addressing claims under § 1985(3)).[6] "Where a plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986." *Braley*, 906 F.2d at 227. Plaintiff does not allege – and the facts do not demonstrate – that the defendants conspired to deprive Castillo of any right protected by § 1985. Because Plaintiff has not alleged a conspiracy under 42 U.S.C. § 1985, her claim under § 1986 necessarily fails. *See id.*

Finally, Plaintiff asserts that "the misconduct of the Sheriff as described [in the complaint] renders him and his surety company liable for damages to Plaintiffs pursuant to TCA §§ 8-8-103 and 8-8-301." (Compl. ¶ 41). This Court has consistently held that § 8-8-103 (providing that a sheriff shall "enter into an official bond . . . faithfully to execute the office of sheriff . . . .") and § 8-8-301 (setting out the obligations of the principal and the surety) do not create private causes of action against a sheriff. *See Green v. Hutchison*, Nos. 3:05-cv-215 & 3:05-cv-268, 2006 WL 1129391 at *2-3 (E.D.Tenn. April 24, 2006); *Waters v. Bates*, 227 F.Supp. 462, 465-66 (E.D.Tenn.1964); *see also Doe v. May*, No. E2003-1642-COA-R3-CV, 2004 WL 1459402, at *5 (Tenn. Ct. App. June 29, 2004) (citing *Waters* with approval).

### A.     42 U.S.C. § 1983

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States

---

[6]     Section 1985(1) prohibits conspiracies that interfere with the performance of official duties by federal officers, and Section 1985(2) addresses conspiracies to obstruct federal and state judicial proceedings. *See* 42 U.S.C. § 1985(1), (2); *Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983). Because this case does not involve federal actors or the administration of justice in federal or state courts, the Court discerns that Plaintiff's complaint relates to § 1985(3).

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005).

To establish a claim pursuant to § 1983, a plaintiff must demonstrate two elements: "(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

Before addressing the substance of Plaintiff's § 1983 claims, it is worth noting that she has sued remaining Defendants Britton, Darby, Florence, Grider, King, Knowles, Matheny, Abel and Jorge Rivera, Sturgill, VanBommel, and Wood in both their individual and official capacities. (Compl. at 1). She has also sued Warren County, the governmental entity by which the individual defendants are employed, on the same bases on which she sued the individual defendants. (*See id.*). It is well-established that "official-capacity" suits "represent only another way of pleading an action against an entity of which an officer is an agent . . . ." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 n.55 (1978); *see Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the

-10-

governmental entity."). Consequently, Plaintiff's § 1983 claims against the Defendants in their official capacities as officers of Warren County are duplicative of her claims against Warren County. Plaintiff's claims against the Defendants in their official capacities are therefore **DISMISSED WITH PREJUDICE**.

Additionally, Plaintiff asserts that the Defendants deprived her of rights established under the First, Fourth, Fifth Amendment, and Fourteenth Amendments, all in violation of 42 U.S.C. § 1983. (Compl. ¶ 39). However, she has identified no set of facts that could reasonably permit this Court to conclude that the Defendants violated Castillo's rights pursuant to those Constitutional provisions. Instead, she solely asserts that the Defendants were deliberately indifferent to Castillo's serious medical needs. Such deliberate indifference could form the basis of a Fourteenth Amendment claim, but only if the claim were asserted on behalf of a pre-trial detainee. *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494-95 (6th Cir. 2008). Because Plaintiff asserts a deliberate indifference claim on behalf of post-conviction inmate, the Court construes Plaintiff's complaint as a claim that the Defendants violated Castillo's rights under the Eighth Amendment. *See id.* at 495. ("The Eighth Amendment, by its terms, applies . . . to post-conviction inmates.").

The individual Warren County Defendants have asserted, *inter alia*, that they are entitled to qualified immunity as to Plaintiff's remaining § 1983 claims. (Court Doc. 55, Warren Cnty. Def.'s Br. at 29). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights which a reasonable person would have known." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quotation omitted). "[Q]ualified immunity in any given case is determined by a two-part inquiry: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* (quotation omitted). Thus, under the first prongs of both the § 1983 and the qualified immunity analyses, the Court must determine if, viewed in the light most favorable to the plaintiff, the evidence demonstrates that the defendant's conduct violated a constitutional right. *See id.* Here, as discussed above, Plaintiff asserts that the Defendants, through their deliberate indifference to Castillo's medical needs, violated the Eighth Amendment's proscription on cruel and unusual punishment.

As applied to prisoners, the Eighth Amendment encompasses a right to medical care for serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). When discussing the contours of the Eighth Amendment's prohibition of deliberate indifference to prisoner's medical needs, the Sixth Circuit has held:

> [T]he Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," and thus courts have imposed liability upon prison officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994) . . . . . Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference. *Estelle*, 429 U.S. at 105-06 . . . .

*Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006). An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer v.*

*Brennan*, 511 U.S. 825, 838 (1994).

Thus, the "deliberate indifference" analysis has both an objective and a subjective component. The objective component requires the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834. The subjective component requires an "inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quotation omitted).

1.    *Sufficiently Serious Medical Need*

A sufficiently serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore* at 897 (quotation omitted). This is based on the premise that, if a medical need is obvious, "the delay alone in providing medical care creates a serious risk of substantial harm." *Id.* at 899. If a medical need is less obvious, however, its seriousness is evaluated by the effect of a delay in treatment. *See id.* at 897-98; *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011). "If a deliberate indifference claim is based on the prison's failure to treat a condition adequately, . . . a plaintiff must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Blosser*, 422 F. App'x at 460 (quotations omitted).

The record is devoid of evidence to suggest that, prior to Castillo's death, a physician had diagnosed him with bronchial pneumonia. Consequently, Plaintiff asserts that his medical need was obvious and, in any case, that treatment was unjustifiably

-13-

delayed to a deleterious effect. (Pl.'s Resp. at 20). In support of this contention, Plaintiff has submitted an expert report by Ann Decherd-Shehan, a registered nurse who recently obtained her Ph.D. in Health Science. (Court Doc. 76-1, Decherd-Shehan Rep.). Decherd-Shehan opined that, based upon her review of the record, Castillo manifested obvious symptoms that clearly demonstrated he was in need of immediate medical attention. (*Id.* at 1-2). She further stated that the symptoms evinced a condition serious enough to warrant immediate medical intervention. (*Id.* at 2). In her opinion, the treatment the jail nurses administered was so minimal as to be ineffective. (*Id.* at 4-5).

The Defendants urge the Court to reject Ms. Decherd-Shehan's report, offering instead the report of Dr. Roy Anderson, a Board-certified medical doctor who reached essentially the opposite conclusions.[7] (Court Doc. 55-18, Anderson Report). Dr. Anderson stated that nothing in the record revealed that Castillo displayed any signs of illness sufficient to permit the jail staff to conclude that medical intervention was necessary. (*Id.* at 2-3). In short, he concluded that Castillo presented no serious symptoms whatsoever, either to himself or to jail staff. (*Id.* at 4).

In suggesting that the Court accept Dr. Anderson's report over Ms. Decherd-Shehan's, the Defendants question the veracity of her credentials and the competency of her testimony. (Court Doc. 87, Warren Cnty. Def.'s Supp. Brief at 16-19). To that end, they have filed Motions *in Limine* to exclude her testimony. (Court Docs. 95, 97). Plaintiff has responded by submitting an affidavit establishing the legitimacy of her qualifications.

---

[7] It appears that, as electronically filed, a page is missing from Dr. Anderson's report. The extant portions of the report make clear Dr. Anderson's conclusions, however, and the missing page does not have a material bearing on the outcome of this case.

-14-

(Court Doc. 103-1). At this stage, without the benefit of a *Daubert* hearing to further explore the Defendant's objections to Ms. Decherd-Shehan as an "expert," the Court is not prepared to grant the Defendants' motions to exclude her testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 147 (1993). Likewise, the Court will not engage in a credibility analysis of the competing experts. To do so would amount to improper fact-finding – in the case of conflicting expert opinions, it is "up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (quotation omitted).

Accordingly, based on the medical evidence of record, there is a genuine issue of material fact as to the objective component of the deliberate indifference standard. On various occasions, Castillo pointed to his head and throat, complaining of various pains. At least once, jail staff noted that he was shivering, and at one point, his body temperature was recorded at just over 95 degrees. Further buttressed by Ms. Decherd-Shehan's conclusions, these facts – if taken together and viewed in the light most favorable to the plaintiff – could permit a reasonable jury to conclude that Castillo's symptoms evinced a sufficiently serious medical condition, so obvious that a layperson would recognize the need for a doctor's attention. *See Blackmore*, 390 F.3d at 899-900.

### 2. *Sufficiently Culpable State of Mind*

To prevail on an Eighth Amendment claim such as this, however, it is not enough for a plaintiff to establish a sufficiently serious medical need. She must also demonstrate that officials acted with deliberate indifference toward that need – that is, that officials possessed "a sufficiently culpable state of mind in denying medical care." *Id.* at 895;

-15-

*Farmer*, 511 U.S. at 834. To survive summary judgment as to this element of her claim, she must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008); *see Farmer*, 511 U.S. at 837; *Williams v. Mehra*, 186 F.3d 685, 691-92 (6th Cir. 1999) (*en banc*) (holding that a prison official cannot be held liable under the Eighth Amendment "unless the official knows of and disregards an *excessive* risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference") (quotation omitted, emphasis original). Prison officials' deliberate indifference violates an inmate's rights "when the indifference is manifested by prison guards intentionally denying or delaying access to medical care for a serious medical need." *Phillips*, 534 F.3d at 539 (quotation omitted).

This is a "stringent standard," meant to "prevent the constitutionalization of medical malpractice claims." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Although a plaintiff need not show that an official acted with the very purpose of causing her harm or with knowledge that harm will result, she must show more than negligence. *Id.*, *citing Estelle*, 429 U.S. at 106. Recklessly disregarding a substantial risk of serious harm to a prisoner is tantamount to acting with deliberate indifference toward that risk. *Phillips*, 534 F.3d at 540; *Farmer*, 511 U.S. at 836. Accordingly, the misdiagnosis of an ailment is insufficient to establish an official's deliberate indifference. *Comstock*, 273 F.3d at 703. Indeed, "[w]here a prisoner has received some medical attention and the dispute is over

the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Arflack v. Cnty. of Henderson, Kentucky*, 412 F. App'x 829, 832 (6th Cir. 2011), *quoting Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see Comstock*, 273 F.3d at 703 ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs.").

The Court must consider the defendants individually, in order to determine whether each had a sufficiently culpable state of mind. *Phillips*, 534 F.3d at 542. Before doing so, however, the Court briefly returns its attention to Ms. Decherd-Shehan's expert report, which concludes generally that jail staff "was deliberately indifferent to [Castillo and] denied him access to appropriate health care for his physical and psychological well being," and which Plaintiff offers as proof of the Defendants' culpable state of mind. (Decherd-Shehan Report at 4-5). However, "'deliberate indifference' is a legal term[, and] [i]t is the responsibility of the court, not testifying witnesses, to define legal terms." *Bradley v. City of Ferndale*, 148 F. App'x 499, 508 (6th Cir. 2005), *quoting Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Even assuming the *bona fides* of Ms. Decherd-Shehan's expert qualifications, she may not testify as to whether the Defendants' conduct amounted to deliberate indifference, and the Court affords her conclusions in that regard no weight. *See id.*

> a.     Correctional Officer Defendants

> (1)     *Jerry Britton*

Officer Jerry Britton first came into contact with Castillo the morning of June 27,

2009.  (Britton Dep. 3).  At the time, Castillo was shivering and complaining of chills and a stomach ache.  (*Id.* at 3).  Rather than disregard his symptoms, Britton and another officer removed him from general population, took him to the booking area, gave him a blanket and allowed him to lie down, retrieved and provided him with crackers and water, called a nurse, and waited with him until the nurse arrived and performed an examination. (*Id.* at 3-4).  Britton remained until Castillo said that he felt better and wished to return to his cell, at which point, Britton escorted him back.  (*Id.* at 4). Their next encounter occurred when Britton was escorting Castillo to a separate cell to protect him from violence.  (*Id.* at 5).  At the time, Castillo appeared fine and did not indicate that he felt poorly.  (*Id.*).  When an inmate told Britton that choking noises were emanating from "D Pod," Britton – who was not near the area – immediately radioed his supervisor for assistance.  (*Id.* at 7).  Britton's other interaction with Castillo was extremely limited, and during those instances of contact, Castillo did not appear ill.  (*Id.*).

Notably, in Plaintiff's response to the Warren County Defendants' Motion for Summary Judgment, she does not specifically address Britton's conduct or how it violated Castillo's constitutional rights.  (*See* Pl.'s Resp. at 2-7).  Castillo appeared ill before Britton only once.  At the end of their encounter, Castillo represented that he was fine and wished to return to his cell, so there is significant question as to whether Britton was aware of a risk to Castillo's health whatsoever.  However, even assuming that he did perceive of a risk, the uncontested facts demonstrate that Britton attended to Castillo and addressed his needs until Castillo represented that he had recovered.   There is no genuine issue of material fact as to Plaintiff's allegation that Britton was deliberately indifferent to Castillo's

-18-

medical needs.  *See Jones*, 625 F.3d at 943 (granting a defendant officer summary judgment and noting that the officer "attended to Jones's medical needs and made efforts to make him more comfortable").

### (2)    *Justin King*

Officer Justin King had very limited interaction with Castillo during the relevant period.  He was among the first to find Castillo's body, but other than that, he was only aware of mumbling that came from the "general direction" of Castillo's cell.  (King Dep. 19). As Plaintiff acknowledges, no one apprised King of Castillo's complaints.  (Pl.'s Resp. at 4; King Dep. 21).  There is no evidence that King was aware of a risk to Castillo's health, much less that he disregarded it.

### (3)    *Abel Rivera*

Officer Abel Rivera first encountered Castillo when, with Officer Britton, he escorted Castillo to a private cell as a precaution against threats Castillo had received.  (A. Rivera Dep. 9).  Castillo appeared healthy and made no complaints.  (*Id.* at 16).  The morning of Castillo's death, Officer Rivera escorted Castillo to the booking area in response to his complaints that he felt hot and thirsty.  (*Id.* at 18).  Once there, Rivera provided him with water, and offered to allow him to shower, which Castillo declined.  (Court Doc. 71-14 at 73).  He also asked if Castillo was sick or needed to see a nurse; Castillo replied that he was not sick and did not require medical attention.  (A. Rivera Dep. 20-21).  Castillo insisted that he was fine and that he was ready to return to his cell.  (*Id.*).  That was Officer Rivera's last encounter with Castillo.  (*Id.* at 24).

As with Officer Britton, it is not at all clear that Abel Rivera was aware that Castillo

-19-

was in serious medical need, in light of Castillo's affirmative representations as to his health. However, even assuming *arguendo* that Rivera did perceive of a risk to Castillo's health, he took reasonable steps to address it, including offering to call a nurse. It was Castillo who declined, insisted he was fine, and requested to return to his cell. Under these undisputed facts, no reasonable jury could conclude that Rivera disregarded Castillo's serious medical needs.

(4)    *Jorge Rivera*

Jorge Rivera encountered Castillo in person only once. When Officer Britton brought Castillo to booking on June 27, 2009, Rivera met them there. (J. Rivera Dep. 11). Castillo was shivering and said "it hurts," pointing to his head as if indicating an earache or toothache. (*Id.*). Rivera stayed with Castillo until the nurse arrived, so that he could translate for her. (*Id.* at 18). The nurse said she would administer medicine, and Rivera left. (*Id.* at 19). The only other time Rivera saw Castillo was from a distance, and Castillo appeared normal. (*Id.* at 20-21).

There is no evidence of record that suggests Jorge Rivera denied or delayed medical treatment to Castillo, in violation of either § 1983 or Warren County policy. (*See* Court Doc. 71-12, S.O.P. at 99). His interaction with Castillo is essentially limited to his service as a translator, facilitating Castillo's medical care at the hands of a trained nurse. His actions indicate an intent to assist rather than punish. Plaintiff has identified no evidence to suggest that Rivera disregarded a substantial risk to Castillo's health, recklessly or otherwise.

-20-

### (5)    *Joseph VanBommel*

On June 27, 2009, Officer VanBommel instructed other officers to bring Castillo to the booking area for treatment in response to his complaints of chills and a stomach ache. (VanBommel Dep. 13, Britton Dep. 3).   VanBommel, the officers' supervisor, followed and observed the nurse's examination.   (VanBommel Dep.15).   When Castillo received threats, VanBommel directed that he be moved for safety.   (*Id.* at 12).   VanBommel also accompanied Officer Abel Rivera the morning of June 29, when Castillo again complained of excessive thirst and a headache.   (*Id.* at 26-27).   VanBommel remained until Castillo said that he felt better and wanted to return to his cell.

Taken in the light most favorable to Plaintiff, the evidence suggests that Officer VanBommel may have perceived the possibility of a risk to Castillo's health.   However, every time VanBommel saw signs indicating a risk to Castillo's health, he responded to the perceived risk.   Each time Castillo presented symptoms of illness, VanBommel either directed that ameliorative measures be taken, or he personally responded in an effort to address the symptoms.   Under these circumstances, no reasonable fact-finder could conclude that he recklessly disregarded Castillo's serious medical needs.

### (6)    *Jason Wood*

Officer Wood saw Castillo only on June 29, 2009.  (Wood Dep. 6).  First, at 6:00 a.m., Wood was performing a head count and asked Castillo if everything was okay.  (*Id.* at 6, 8-9).  Castillo "shook his head yes."  (*Id.* at 9).  Later that day, Wood asked Castillo if he wanted to go outside for recreation.  (*Id.* at 9-10).  Castillo indicated that he did not. (*Id.* at 10).  Castillo did not look unusual when Wood saw him.  (*Id.* at 10).  Until finding

Castillo deceased in his cell, Wood did not see him again.

Even when viewed in the light most favorable to Plaintiff, the facts do not establish that Castillo ever manifested symptoms of illness before Officer Wood. No reasonable jury could conclude that Wood perceived that Castillo was suffering from a serious medical risk. Because the facts do not demonstrate that Wood was aware of a serious medical need, he could not have been deliberately indifferent to it.

Plaintiff has not presented evidence that would permit a reasonable fact-finder to conclude that the correctional officers were deliberately indifferent to Castillo's serious medical needs. As there is no genuine issue of material fact sufficient to merit trial, Defendants Britton, King, Abel Rivera, Jorge Rivera, VanBommel, and Wood are entitled to summary judgment, and Plaintiff's 42 U.S.C. § 1983 claims against them will be **DISMISSED WITH PREJUDICE**.

b.    <u>Nurse Defendants</u>

(1)   *Carol Darby*

Of all Defendants, Nurse Darby appears to have interacted with Castillo most extensively. Her first encounter occurred on June 26, 2009, when Castillo complained of general sickness and pointed to his jaw. (Darby Dep. 10-12). He did not offer any other complaints, and she provided him Tylenol. (*Id.* at 11). She next saw him on June 27, when officers called her to the booking room in response to his complaints. (*Id.* at 13-14). With the assistance of Officer Rivera, Castillo told her that he was sick. (*Id.* at 14-15). He made no specific complaint, but he pointed to his throat and physically manipulated it. (*Id.* at 15). Darby examined him for swollen glands but felt none. (*Id.*). She performed a

-22-

physical examination, and although she discovered that his temperature was 95.4 degrees – below the 98.6 "normal" temperature – she did not think that signified a serious problem, given that she believed Castillo to have been intoxicated earlier and residing in a cell with no covers. (*Id.* at 17). Subsequently, Darby saw Castillo three times while distributing medicine. (*Id.* at 18-24). The first two times, she gave him Tylenol and he accepted, making no complaints or other conversation. (*Id.* at 19-20). On her third encounter, she attempted to distribute Tylenol, but he returned it, and he did not respond when she asked if he was feeling better. (*Id.* at 22-23). During these encounters, Castillo did not appear ill. (*Id.* at 23).

Plaintiff asserts that Nurse Darby's treatment was inadequate and that she should have taken more drastic action when confronted with Castillo's complaints. But to the extent that Darby perceived risks to Castillo's health, she took commensurate action to alleviate them at every opportunity, and the Court is reluctant to second-guess the adequacy of the treatment she provided. *See Arflack*, 412 F. App'x at 832. This is especially true given the generalized and highly unspecific nature of Castillo's complaints, his representations that he was feeling better after treatment, and his ultimate refusal of analgesic medicine. *See Comstock*, 273 F.3d at 706 (holding that a defendant may prevail on summary judgment if she "responded reasonably to the risk even if the harm ultimately was not avoided") (quotation omitted).

Construed most favorably to Plaintiff, the facts permit the Court to infer that Nurse Darby was aware that Castillo's health was at risk. They do not, however, permit the further inference that she disregarded that risk. To the contrary, Nurse Darby attempted

to administer treatment appropriate to Castillo's symptoms each time she encountered him.

Because she did not recklessly disregard a serious risk of harm to Castillo, Plaintiff has not demonstrated that she acted with deliberate indifference to his medical needs.

### (2) *Kay Grider*

Nurse Grider encountered Castillo only once before he died. On June 25, 2009, an inmate beckoned her to Castillo's side. (Grider Dep. 9-10). Castillo pointed to his throat without speaking. (*Id.* at 9). When Grider asked if he had a sore throat, he shook his head in the negative, though it was not clear if he understood her question. (*Id.* at 9, 13). She therefore took his complaint to indicate swollen glands, and she administered ibuprofen. (*Id.* at 13-14).

It is difficult for the Court to conclude that, based on a single gesture, Nurse Grider could have drawn the inference that Castillo's health was in serious jeopardy. Even assuming that she *could* have drawn such an inference, however, there is no evidence to suggest she actually did. Based on her testimony and her medical notations, Grider believed Castillo to be suffering from slight glandular swelling without a sore throat, not a condition that presented an excessive risk to his health, and she treated him accordingly. (Court Doc. 71-14 at 165). Although Plaintiff contends that Grider should have been more cognizant of the risks presented by Castillo's symptoms, Grider's failure to alleviate a risk that she *should* have perceived, but did not, cannot be said to form the basis of an Eighth Amendment violation. *Farmer*, 511 U.S. at 838.

### (3) *Christy Sturgill*

Nurse Christy Sturgill did not encounter Castillo in the days preceding his death.

-24-

The only information she received regarding his condition came the morning of June 29, 2009, from Officer Abel Rivera, who – after Castillo had told officers that he was recovered and did not need to see a nurse – informed Sturgill that Castillo was "acting up again" and suggested that she "might need to check [him] out." (Court Doc. 71-14 at 74, 160). Sturgill suggested that officers return him to booking to be examined, but they never had opportunity to do so, because a violent inmate required their attention instead. (Court Doc. 71-14 at 74).

Nurse Sturgill neither spoke to nor saw Castillo during the relevant period. The information she received about his condition came from a third party, and in any event, it was too vague to indicate any serious medical risk. Plaintiff has pointed to no facts that suggest that Sturgill was afforded the opportunity to "subjectively perceive[] facts from which to infer substantial risk" to Castillo. *Phillips*, 534 F.3d at 540.

Because the evidence viewed most favorably to Plaintiff would not allow a reasonable finder of fact to conclude that any jail nurse acted with deliberate indifference toward his serious medical needs, the nurses are entitled to summary judgment. Accordingly, the claims against Defendants Darby, Grider, and Sturgill will be **DISMISSED WITH PREJUDICE**.

### c.     Jackie Matheny, Edward Knowles, and David Florence

Plaintiff has also asserted § 1983 claims against Sheriff Matheny, Jail Director Knowles, and Dr. Florence in their supervisory capacities. The facts do not demonstrate – and Plaintiff does not contend – that Matheny, Knowles, or Florence had any interaction with Castillo at any point in days preceding his death. (*See* Pl.'s Resp. at 2-3, 15-17; Court

-25-

Doc. 68, Pl.'s Resp. to Florence at 10; Court Doc. 71-1, Matheny Dep. 17; Court Doc. 71-2, Knowles Dep. 14). Instead, Plaintiff asserts that these defendants failed to train their employees and implement adequate protocols. (*Id.*). This, she alleges, demonstrates their deliberate indifference to Castillo's medical needs. (*Id.*).

The Sixth Circuit has held that "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act . . . . Rather, the supervisors must have actively engaged in unconstitutional behavior." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (quotation omitted). *"*At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *See Phillips*, 534 F.3d at 543.

The Court notes that, as above, Plaintiff has submitted no evidence sufficient to demonstrate that the correctional officers or nurses engaged in unconstitutional conduct. Consequently, she cannot establish that the supervisors authorized, approved of, or knowingly acquiesced in conduct that violated Castillo's constitutional rights. *See id.* For this reason – and for the reasons stated below – her supervisory liability claims against Defendants Matheny, Knowles, and Florence fail. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) ("Because McQueen also has not pointed to unconstitutional conduct by any other employee supervised by Hughes, it necessarily follows that the supervisory liability claim against Hughes must fail.").

Sheriff Matheny's direct involvement in this case is minimal. The only encounter he had with Castillo was after Castillo had died. (Matheny Dep. 17-20). He was never informed that Castillo was ill, and he did not direct employees' actions as to Castillo's

medical care. (*See id.*). Jail Director Knowles also had no contact with Castillo. (Knowles Dep. 14). The first time Knowles knew that Castillo was incarcerated was upon learning of his death. (*Id.*). When viewed most favorably to the Plaintiff, the evidence cannot support the conclusion that Matheny or Knowles in any way "actively engaged" in any conduct toward Castillo, much less unconstitutional conduct. They therefore cannot be held liable under § 1983. *See Gregory*, 444 F.3d at 751. Accordingly, Plaintiff's § 1983 claims against Defendants Matheny and Knowles will be **DISMISSED WITH PREJUDICE**.

For the same reasons, Plaintiff's § 1983 claim against Dr. Florence must fail. The Court first notes that, despite Dr. Florence's self-characterization as an "independent contractor" and "resource person," he approved and signed the jail's medical protocols, he regularly visited the jail, the nurses reported to him, and Sheriff Matheny stated that jail officials were "under his orders." (Court Doc. 71-11, Florence Dep. 15, 18-20; Matheny Dep. 7; Medical Protocols at 1). This evidence could permit a reasonable jury to conclude that he was a state actor subject to § 1983. *See Bell v. Mgmt. Training Corp.*, 122 F. App'x 219, 223 (6th Cir. 2005) ("The fact that a municipality is responsible for providing medical attention to persons held in custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 . . . .").

Nevertheless, even viewed most favorably to plaintiff, the evidence does not support a finding that Dr. Florence is liable under § 1983 in his capacity as the jail nurses' supervisor. Dr. Florence did not know that Castillo was in the Warren County Jail. (Florence Dep. 17). The nurses never notified him of Castillo's presence or medical needs. (*Id.*). He was unaware of the nurses' conduct in the days leading up to Castillo's death,

-27-

and consequently, he could not have encouraged or participated in it.  *See Phillips*, 534 F.3d at 539.  Plaintiff has pointed to no additional evidence suggesting that Dr. Florence otherwise engaged in unconstitutional conduct toward Castillo, so her claim against him cannot survive summary judgment.  Plaintiff's § 1983 claim against Dr. Florence will therefore be **DISMISSED WITH PREJUDICE**.

Plaintiff's remaining § 1983 arguments – that officials failed to train employees or promulgate appropriate policies – improperly conflate claims of individual supervisory liability with claims of municipal liability.  *See Phillips*, 534 F.3d at 539.  To the extent that Plaintiff's claim relies on such theories of municipal liability, it is actually a claim against Warren County, addressed below.  *See id.*

### 3. *Municipal Liability – Warren County*

The only remaining § 1983 claim in this action is against Warren County.  Plaintiff asserts that the County, through its policymakers, failed to "train ... jail personnel ... to [e]nsure that existing protocols and applicable standard operating procedures were followed," and "fail[ed] to promulgate sufficient reasonable and necessary protocols to provide for the adequate monitoring, medical examination and care of inmates in the Warren County Jail."  (Compl. ¶¶ 32-33).  As further explained in her responses to the Defendants' Motions for Summary Judgment, this element of her complaint is manifest two ways: first, that jail officials (i.e., Knowles and Matheny) put in place Standard Operating Procedures that "do not have provisions or instructions for the . . . correctional officers to follow if an inmate is found to need medical attention"; and second, that Dr. Florence, as the medical policymaker, failed to provide adequate policies and training to the nursing

staff. (Pl.'s Resp. at 17; Pl.'s Resp. to Florence at 1, 13-14).

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior. Monell*, 436 U.S. at 692-94 (1978). To establish municipal liability under section 1983, the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation, and (2) the municipality was responsible for that violation. *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an implementation of the municipality's official policies or established customs. *Id.*

Plaintiff's first claim – that the Standard Operating Procedures for correctional officers had no provisions addressing an inmate who needs medical attention – is directly contradicted by the record. The Standard Operating Procedures have a section titled "Support Services," which largely deals with inmates' medical needs. (Court Doc. 71-12, S.O.P. at 99-106). In a section titled "inmate health care," it dictates that "[a]ll inmates with medical problems will be seen by the on duty nurse, except in a medical emergency." *Id.* at 99-100. In emergencies, the correctional officers must coordinate emergency transport. *Id.* at 99. The procedures also call for the provision of medical treatment request forms, and they mandate that inmates have access to appropriate "health care services for their physical and psychological being." *Id.* Indeed, the policy specifically prohibits correctional officers from deliberately denying or delaying medical access to health services. *Id.* In short, to the extent that Plaintiff claims that Sheriff Matheny and Jail Director Knowles have failed to promulgate regulations to their correctional officers that provide for encounters with inmates in need of medical attention, their claims are without merit.

Plaintiff also alleges that the County – through the protocols of "jail doctor" David Florence – failed to train its nurses adequately. "The County is liable under § 1983 for failure to train if the Plaintiff can prove three elements: (1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the County's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quotation omitted).

Plaintiff claims that the jail's lack of adequate medical protocols was, in effect a constitutional violation. Notably, this claim is substantially undercut by her earlier contention that: "[the nurses] violated the medical protocols that were current and in place for Warren County Jail. This violation was the proximate cause of Mr. Castillo's death and therefore, [the nurses] should be held liable for their actions." (Pl.'s Resp. at 4); *see Powers v. Cnty. of Lorain*, 259 F. App'x 818, 822 (6th Cir. 2008), *citing Perez*, 466 F.3d at 432 (6th Cir.2006) (finding that the plaintiff's argument that jail staff's failure to follow established County policy resulted in a constitutional violation undercut his argument that the County's policies were the cause of the violation). Despite her repeated assertions that the jail's medical protocols were inadequate and allegations that the nurses' conduct was deficient, Plaintiff has not pointed to evidence which suggests that protocols failed to address the tasks that a jail nurse must perform. *See Plinton*, 540 F.3d at 464. The 24-page document covers a range of conditions and symptoms and dictates corresponding responses. While Plaintiff's unsupported allegations as to the insufficiency of the medical protocols may be enough to survive a motion to dismiss, they are not adequate at the summary judgment stage. Because she has failed to make a sufficient showing on this

essential element of her case with respect to which she has the burden of proof, the County is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Accordingly, Plaintiff's § 1983 claims against Warren County will be **DISMISSED WITH PREJUDICE**.

### B. State Law Claims

In her complaint, Plaintiff cursorily asserted an alternative claim of wrongful death resulting from the "Defendants' gross negligence or negligence." (Compl. ¶¶ 31, 40). Initially, the Court notes that, in the course of litigation, Plaintiff appears to have all but abandoned this claim. For example, in her pleadings and her various responses and supplemental responses to the Defendants' Motions for Summary Judgment, she has not once identified the basic elements of a negligence claim or argued that she has met those elements. See *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and alterations omitted). Nevertheless, because Plaintiff specifically pleaded a wrongful death claim and the Defendants have offered concomitant motions for summary judgment, the Court will address them here.

The individual Defendants have first asserted that they are entitled to total immunity under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101. (Warren Cnty. Def.'s Br. at 32). They are not. Generally, TGTLA immunity only attaches to government entities, not to individual governmental employees. *See Fann v.*

-31-

*City of Fairview*, 905 S.W.2d 167, 174 (Tenn. Ct. App.1995). Under the TGTLA, if the municipality at issue is has waived its immunity from suit, then the municipality's employees are immune from suit. Tenn. Code Ann. § 29-20-310(b); *Sallee v. Barrett*, 171 S.W.3d 822, 826 (Tenn. 2005). Conversely, if the municipality has not waived its immunity, then its employees are proper party-defendants. Tenn. Code Ann. § 29-20-310(c). The TGLTA waives immunity for "injur[ies] proximately caused by a negligent act or omission of any employee within the scope of his employment." Tenn. Code Ann. § 29-20-205. But there is an exception to this waiver for claims based on injuries arising out of "civil rights" claims, for which the municipality retains its immunity. Tenn. Code Ann. § 29-20-205(2). Plaintiff's suit is based primarily on a 42 U.S.C. § 1983 civil rights claim. Consequently, Warren County is immune from suit, and its employees are proper parties.

Plaintiff's wrongful death claim is premised on an allegation that prison officials were negligent in addressing Castillo's condition, ultimately causing his death. *See Lynn v. City of Jackson*, 63 S.W.3d 332, 336 (Tenn. 2001) (holding that Tennessee's wrongful death statute does not create a new cause of action, but rather preserves the right of action of the decedent). Her complaint implicates two standards: ordinary negligence as applied to the jail directors and correctional officers, and medical malpractice as applied to the nurses.

1. *Correctional Officers, Jackie Matheny, and Edward Knowles*

In order for a plaintiff to prevail on a claim of negligence, the following elements must be established: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss;

(4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995). Foreseeability is one element of a three-pronged test of proximate causation:

> 1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn.1991) (citations omitted). If the injury giving rise to the plaintiff's cause of action was not reasonably foreseeable, then there is no proximate cause and no liability for negligence. *See Hale v. Ostrow*, 166 S.W.3d 713, 718-19 (Tenn. 2005).

Plaintiff has failed to make arguments concerning the elements of a Tennessee negligence claim as applied to Castillo's circumstances. Even if the Court were to assume *arguendo* that she could establish all other elements of her claim, no evidence of record suggests that the non-medical jail staff could have reasonably foreseen Castillo's death based on his manifest symptoms. Castillo offered general complaints of headaches, stomach aches, and chills. Moreover, each time correctional officers did observe the symptoms, their ameliorative attempts appeared to be successful, and Castillo told them that he felt better and wanted to return to his cell. Considering the facts in the light most favorable to the plaintiff, none of the jail directors or correctional officers could have reasonably foreseen that bronchial pneumonia would ultimately take Castillo's life. Because this is an essential element of Plaintiff's wrongful death claim against Defendants Matheny, Knowles, Britton, King, Abel Rivera, Jorge Rivera, VanBommel, and Wood, those

defendants are entitled to summary judgment, and Plaintiff's state law claims against them are **DISMISSED WITH PREJUDICE**.

    2.   <u>Nurse Defendants</u>

Plaintiff's "negligence" claims against the jail nursing staff are actually claims of medical malpractice. "[W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute[, Tenn. Code Ann. § 29-26-115, *et seq.*] is applicable." *Estate of French v. Stratford House*, 333 S.W.3d 546, 555 (Tenn. 2011) (quotation omitted). Tennessee's medical malpractice statute may apply to non-physicians if they are involved in the medical treatment of patients. *Id.* at 556. Because Plaintiff's negligence claim against the nurses implicates their status as medical professionals and involves their diagnoses and Castillo's treatment, it is appropriately considered a medical malpractice claim.

Whether claims are characterized as ordinary negligence or medical malpractice affects the nature of litigation. *See id.* at 555. Among other things, a medical malpractice claimant must establish the statutory elements through the testimony of an expert who meets the qualifications set forth in Tenn. Code Ann. § 29–26–115(b). *Id.* Those elements are:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

-34-

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115.

Again, Plaintiff has failed to identify these elements or how they apply to her case, even after the Defendants cited them in their briefs. (*See* Warren Cnty. Def.'s Br. at 36-37; Pl.'s Resp.; Court Doc. 89, Pl.'s Supplemental Resp.). Ms. Decherd-Shehan is the only expert witness Plaintiff has offered in support of her claim. (*See* Decherd-Shehan Rep.). In her report, Decherd-Shehan recounted the facts and ultimately concluded that: Castillo demonstrated a manifestation of illness which should have alerted the nurses to his condition, the nurses should have contacted their supervisor or taken him to the hospital, and the treatment Castillo received was so cursory as to amount to no treatment at all. (*Id.* at 2, 4-5).

It is fair to say that Decherd-Shehan's report supports a conclusion that the jail nurses did not act with ordinary and reasonable care. The report does not, however, address the standard of care applicable to jail nurses. Likewise, although it condemns the nurses' diagnoses and suggests alternative treatments, nowhere does it actually address whether the nurses' alleged malpractice was the proximate cause of Castillo's death from bronchial pneumonia. These are meaningful omissions: under Tennessee law, Plaintiff is required to present expert testimony to establish the standard of care applicable to the Defendants' practice area and to demonstrate that, as a result of the Defendants' alleged negligence, Castillo suffered injuries which would not have occurred otherwise. Tenn. Code Ann. § 29-26-115. She has not done so, so her malpractice claim fails as a matter of law.

-35-

Accordingly, Plaintiff's state law claims against Carol Darby, Kay Grider, and Christy Sturgill will be **DISMISSED WITH PREJUDICE**.

The Court notes that Plaintiff has explicitly disavowed any negligence or malpractice claims against David Florence. (Pl.'s Resp. to Florence at 1, 9, 16) ("Plaintiffs have not alleged inadequate medical treatment by Dr. Florence, only that he failed to supervise the nursing staff at the Warren County Jail."). In light of her express abandonment – as well as the Court's reasoning above, which would apply equally to Dr. Florence – to the extent that her complaint states a cause of action for negligence or medical malpractice against Dr. Florence, that claim will be **DISMISSED WITH PREJUDICE**.

## IV.     CONCLUSION

Accordingly, and for the reasons stated above:

- The Motion for Summary Judgment and/or Motion to Dismiss [Court Doc. 54] filed by Sherry Bailey; Bruce Boyd; Jerry Britton; Dustin Curtis; Carol Darby; Kay Grider; Justin King; Edward D. Knowles; Jackie Matheny; Tommy Myers; Abel Rivera; Jorge Rivera; Christy Sturgill; Joseph VanBommel; Jason Wood; Anita Youngblood; and Warren County, Tennessee is **GRANTED**;

- The Motion for Summary Judgment filed by David Florence [Court Doc. 56], is **GRANTED**;

- All Plaintiff's claims against all Defendants are hereby **DISMISSED WITH PREJUDICE**; and

- All outstanding motions in this case are hereby **DENIED AS MOOT**.

-36-

The Clerk is directed to close this case and enter a separate judgment in accordance with Federal Rule of Civil Procedure 58(a).

**SO ORDERED** this 6th day of September, 2011.


_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE